IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |
|---|---|
| ERNEST RAY OLIVER, JR., | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) CAUSE NO.: 1:15-CV-00942-TWP-DKL |
|  | ) |
| CAROLYN W. COLVIN, | ) |
| As Acting COMMISSIONER OF THE | ) |
| SOCIAL SECURITY ADMINISTRATION | ) |
| Defendant. | ) |

## PLAINTIFF'S BRIEF IN SUPPORT OF JUDICIAL REVIEW

### I. Statement of the Case

Plaintiff, Ernest Ray Oliver, Jr., (hereinafter also referred to as "claimant" and "plaintiff")  seeks judicial review of the Commissioner of the Social Security Administration's (hereinafter "SSA" or "the Agency") final decision denying the plaintiff's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act filed pursuant to 42 U.S.C. § 423.  A decision denying the plaintiff's claim for Title II DIB Benefits was issued on November 25, 2013 (Tr.17-45) by the Honorable Tammy Whitaker, Administrative Law Judge (hereinafter "ALJ").  The plaintiff's request for review by the Appeals Council was denied on April 17, 2015 (Tr.1-5 ) and the November 25, 2013 Decision denying the Plaintiff's DIB Benefits under Title II of the Social Security Act became the final decision of the Commissioner of the Social Security Administration.  The plaintiff has exhausted all administrative remedies and seeks judicial review of the final decision of the Agency.

The Claimant initially filed an application for Disability Insurance Benefits ("DIB") under Title II of the  Social Security Act on September 19, 2011 (Tr. 380-386).  He also filed an application for Supplemental Security Income Benefits ("SSI") under Title XVI of the Social Security Act  on September 19, 2011 (Tr. 347-352).  In his DIB and SSI Applications, the plaintiff alleged an onset of disability date of February 1, 2008 (Tr. 347, 380). The claimant's DIB Application was denied on October 14, 2011 (Tr. 213-216).  The claimant's SSI application was also denied on October 14, 2011 (Tr. 217-220).   The

claimant stated date of last insured was June 30, 2009 (Tr. 216). The DIB Decision indicates,

> "The medical evidence shows that there was not enough information in file in order to fully assess both your physical and mental conditions prior to 6/30/2009. The evidence does not show any other condition which would have significantly limited your ability to work. Additionally, any symptoms, such as pain, were considered in deciding this claim." (Tr. 216)

The Claimant then filed subsequent applications for DIB[1] (Tr. 20, 52) and SSI (Tr. 353-361, 20, 52) on January 10, 2012, in which he alleged the same alleged onset date of the previous application, to wit, February 1, 2008 (Tr. 353).  The claimant's January 10, 2012 Title II application was denied on January 15, 2012 (Tr. 247-249) due to a res judicata issue (as a result of the claimant having received a previous determination for the time period of February 1, 2008 through October 14, 2011 and the date of last insured of June 2009).

The plaintiff appointed Jennifer M. Hess as his Attorney Representative on January 18, 2012 (Tr. 118).  On January 23, 2012, Counsel for the claimant filed a Request for Reconsideration of the January 15, 2012 Title II decision and filed a motion to reopen the previous Title II determination (Tr. 119-121, 227-231).

On March 15, 2012, the claimant's Title XVI Application (which was filed on January 10, 2012) was denied (Tr. 122-130).   The Plaintiff, by counsel, filed a Request for Reconsideration with respect to the claimant's Title XVI claim on May 15, 2012 (Tr. 131-133). The Request for Reconsideration was denied on July 11, 2012 (Tr. 134-140).   The Plaintiff, by counsel, filed a timely Request for Hearing on September 12, 2012 (Tr. 141-143).

On February 1, 2013, the Plaintiff, by Counsel contacted the Indianapolis Office of Disability Adjudication and Review Hearing Director indicating that the ALJ Hearing should cover both the claimant's DIB and SSI claims and indicating a desire to resolve this prior to hearing.  (Tr. 176-202).

As no response was every received, Attorney for the claimant sent additional correspond to the ALJ on June 7, 2013 (Tr. 211-253) to confirm that the hearing should cover both the claimant's DIB and SSI Applications as no determination has ever been made as to the January 23, 2012 request to reopen the

---

[1] The January 10, 2012 DIB Application is not contained in the record, but is referenced at Tr. 20 and 52 by the ALJ both in her decision and at the hearing on August 1, 2013.

prior applications. Notice was given to counsel for the claimant, Jennifer Hess, via a telephone message on July 23, 2013 (8 days before the hearing) that the ALJ granted the January 23, 2013 Motion to Reopen the Title II Case. A revised Notice of Hearing was issued on July 19, 2013 (Tr. 311-334) indicating that the hearing would cover both the DIB and the SSI application from 2011 (Tr. 313) along with a waiver of the 20 day requirement for written notice of hearing (Tr. 318).

A hearing was held on August 1, 2013 (Tr. 46) before the Honorable Tammy Whitaker, Administrative Law Judge (hereinafter "ALJ") in the Indianapolis, Indiana Office of Disability Adjudication and Review, at which time the Plaintiff appeared in person and by counsel, Jennifer M. Hess.   Constance R. Brown was also present as a vocational expert.  (Tr. 46)

The ALJ issued an unfavorable decision denying the plaintiff's application for Disability Insurance Benefits on November 25, 2013 (Tr. 17-45 ).  The clamant, by council, timely filed a Request for Review of Hearing Decision/Order (HA-520) on January 16, 2014 (Tr. 14-16 and Tr. 569-570)[2]. The plaintiff's request for review was denied on April 17, 2015 (Tr.1-5), making the ALJ's denial of benefits the final decision of the Commissioner of the Social Security Benefits.

## II. Statement of Facts

The plaintiff was born on May 27, 1977  (Tr. 347).   The plaintiff filed applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act on September 19, 2011 and completed an Adult disability Report in which he alleged disability due to "1. Nerve problems, 2. anxiety, 3. depression, 4. concentration problems, 5. difficulties since shot in head"  (Tr. 393 ).  He alleged on onset of disability date of February 1, 2008 (Tr. 389).  The plaintiff was 29 years of age as of his alleged onset of disability date.  He has a date of last insured of June 30, 2009 (Tr. 23).

The claimant was the unfortunate victim of a carjacking in 2002.  This is substantiated by the Community Hospital Records (Tr. 583-606).  The plaintiff was admitted to the Community Emergency Room on November 17, 2002 (Tr. 584).   It is noted at this time that he is employed as a "Concrete

---

[2] The two (2) pages of attachments contained at Tr. 569-570 were part of the HA-520 Request for Review of Hearing Decision/Order filed January 16, 2014 and were erroneously removed from the HA-520 form and placed elsewhere in the file.

Mix[six]"er with Custom Cast Stone (Tr. 584).  It is noted that he was "ROBBED AND HIT" and the Diagnosis is "ASSAULT." (Tr. 584).   He is noted to have bruising to his upper and lower bilateral lower extremities, to his left arm, and to his right hand along with facial bruising and swelling and an open wound to his right shin (Tr. 590).  He is further noted to have a "puncture wound behind left ear" with "black, charred skin around wound" (Tr. 590)  A laceration to the left side if mouth "through and through" is noted as well as a "laceration to inner cheek on left side." (Tr. 590)  Diagnoses include "DIAGNOSIS: Left ear laceration 3 cm, multiple facial contusions, intraoral laceration, and right leg laceration." (Tr. 587)  The left ear laceration is described in more detail at Tr. 589 in which it is described as a "Complex LA through cartilage" as a result of a "Blast Injury." (Tr. 589)  Furthermore, the lacerations to the oral cavity are also noted to be "complex" (Tr. 589).   The notation of the blast injury to the ear (Tr. 589) along with black, charred skin (Tr. 590) is consistent with the plaintiff's allegation that he did indeed sustain a gunshot injury.   The claimant's allegations of being shot are further substantiated in an Indianapolis Police Department Report detailing the incident (Tr. 815-817).  The police officer making the police report "received a radio run to Community Hospital East to take a person shot report." (Tr. 816).  The claimant alleges that he lost several teeth as a result of the beating (Tr. 76, 396), noting "they beat me almost half to death, knocked my teeth out, and then shot me" (Tr. 693).  A 11/17/2002 CT scan of the face at shows two broken posterior maxillary molar teeth on the left side (Tr. 599).

The claimant has a 9th grade education, having completed the 9th grade in 1995 (Tr. 394, 423).  He reports having jobs in construction, seal coating driveways, and shipping and receiving (Tr. 394).  According to his earnings statement, the claimant had a consistent work history from 1993 through 2002 (with the exception of 1998) (Tr. 362-363).  A detailed listing of the claimant's work is found at Tr. 818-819.

Following the assault, the claimant reports that he had difficulty working.  He reported at on September 28, 2011 that he stopped working due to his condition (Tr. 393).  The claimant reports to Dr. London, the consulting examiner, ""I've been depressed at about it ever since it happened. Over the years, it's gotten worse and worse" (Tr. 643) and also reports to Dr. Gasiewicz that that he is getting worse on

10/4/2011 (Tr. 650).  The Aspire notes indicate he has not been able to hold a job since 2008 (Tr. 760).

The claimant reports an alleged onset of disability date as February 1, 2008, however, the claimant's work

history shows additional work in 2008 (Tr. 366).  In 2007, the claimant has $1663.00 in self-employment

earnings and then $1241.63 in earnings from Meijer. (Tr. 377).  In 2008, the claimant had $4137.55 in total

yearly earnings; $2814.88 of the 2008 income was from earned from work at Meijer (Tr. 378).  The

claimant earned $822.67 from the Cain Corporation and $500.00 from Elwood Staffing in 2008 (Tr. 377-

378).  It does not appear that either work at Cain Corporation or Elwood Staffing rose to the level of

Substantial Gainful Activity (Tr. 362-363), let alone successful work attempts.

 The claimant is very dependent on his mother and essentially does not leave the house alone.  On

9/28/2011 the claimant reported that his mother helped you with daily tasks such as laying out his clothes

for him to dress and laying in his toiletries for him to take a shower (Tr. 400).  The claimant does not drive

and his mother goes out of the house for him 90% of the time (Tr. 402).  He also reports that he needs

someone with him at all times (Tr. 403)  During a face-to-face interview with the claimant, Disability

Interviewer A. May notes on January 10, 2012 that the plaintiff is "coherent, courteous, cooperative, very

soft-spoken, flat affect, accompanied by mother." (Tr. 420).   The claimant's mother is noted to attend

almost all appointments with the claimant (Tr. 748, 740, 650) and even participated in the interview with

the consulting examiner, Dr. London (Tr. 691).  The claimant reports that his mother drives him

everywhere and that he has not driven since 2008 or 2009 (Tr. 79).  He notes, "but I don't go nowhere

without my mother. She goes I mean, everywhere I go is -- she's with me." (Tr. 83).  In the 5/18/2012

Disability development contact note of J. Fink of the Social Security Administration, it is noted that

"Claimants mother assisted with 3441. Claimant could not remember dates or Dr's names." (Tr. 469).

 The claimant suffers from Post-Traumatic Stress Disorder.  (Tr. 779, 840).  Symptoms include

anxiety (Tr. 779, 760, 780, 788, 806), excessive worrying (Tr. 779, 806, 750), apprehension (Tr. 779, 780,

826, 834, 842), intrusive thoughts (Tr. 760, 693), hyper-vigilance  (Tr. 760, 753), constant anxiety (Tr.

760),  flashbacks (Tr. 760),  nightmare (Tr. 760, 753),  and night sweats (Tr. 760).  The claimant also

suffers from Major Depression- - Chronic. (Tr. 779, 840) and panic attacks (Tr. 693, 753, 756, 757, 758, 764, 788, 797, 805, 805, 813, 79, 737, 76, 699, 702).

At the time of the alleged onset date, the claimant had had no treatment for his mental health conditions. Other than treatment notes for physical ailments, the claimant has no mental health records prior to the Consulting Examination with Dr. Bryan London on 10/3/2011

Following a Consultative Examination by Dr. Bryan London, EdD, HSPP on 10/3/2011, the Plaintiff is diagnosed with PTSD, Major Depressive Disorder, Single Episode, Moderate Severity, Anxiety Disorder- NOS, Alcohol Abuse- Early Full remission, Cannabis Dependence- Sustained Full Remission, R/O Cognitive Disorder- NOS (Tr. 648). The claimant is noted to have a Global Assessment of Functioning ("GAF") of 51[3] (Tr. 648)

The claimant underwent a Consultative Physical Examination on 10/4/2011 by Dr. Gasiewicz, MD of the The Jean Clinic, LLC. (Tr. 650-654). Dr. Gasiewicz notes "Claimant states that he cannot work because he cannot concentrate instructions. He cannot remember what he is supposed to do and has trouble with instructions. He has had this problem since he was shot in the head during a carjacking in 2003 . . . He states he is depressed and getting worse. . . " (Tr. 650). He further notes, "Claimant is able to perform household chores with difficulty. Claimant was employed as in shipping at Meyer and left in 2008 because he could not concentrate or follow directions. He states he thinks about the attack more and more all the time." (Tr. 650). Dr. Gasiewicz notes that the claimant lives with his mother who accompanied him to the exam. (Tr. 650). He further notes, "He is very focused at present on the attack on his person years ago and states he thinks about it al] the time, and getting worse." (Tr. 652). Dr. Gasiewicz expressed concern regarding the claimant; " He has not had any evaluation in a long time and does express some concerns

---

[3] A Global Assessment of Functioning of 51 – 60 denotes " Moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) *or* moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." A Global Assessment of Functioning of 41 - 50 denotes "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) *or* any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders*: DSM-IV-TR. Washington, DC: Author. p. 34.

about his memories of the carjacking. I have no data to show any higher mental function status. He is definitely anxious about the past attack on him and is not getting any evaluation or treatment." (Tr. 652).

A 10/7/2011 Mental Residual Functional Capacity Assessment was completed by non-examining sources Dr. Amy S. Johnson, Ph.D.  Despite not having any treatment notes from any sources for the claimant, she finds moderate limitations with respect to the following:

> A. Understanding and Memory:
>> 3. The ability to understand and remember detailed instructions- Moderately Limited (Tr. 656)
> B. Sustained Concentration and Persistence:
>> 5. The ability to carry out detailed instructions -Moderately Limited (Tr. 656)
>> 6. The ability to maintain attention and concentration for extended periods- Moderately Limited (Tr. 656)
>> 8. The ability to sustain an ordinary routine without special supervision- Moderately Limited (Tr. 656)
>> 11. The ability to complete a normal work day  and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods -Moderately Limited (Tr. 657)

Dr. Johnson indicates that the claimant meets with "A" Criteria of Listing 12.06 indicating the claimant has " Anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following"  for which she  indicates " 5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress" (Tr. 665).  Dr. Johnson found the claimant to have Moderate Difficulties in Maintaining Social Functioning and Moderate Difficulties in Maintaining Concentration, Persistence, or Pace (Tr. 670).

The claimant was seen by Nelle Brown, a nurse practitioner at Riverview Hospital on November 29, 2011 where he was noted to have post-traumatic stress disorder and depression (Tr. 679). He is prescribed Altrax and Paxil and referred to Aspire (Tr. 679).

The claimant is seen again at Riverview by Alla Y. Soyfer, NP on December 27, 2011, where it is noted that "He has very flat affect, poor eye contact and poor communication" (Tr. 680). Impressions are noted to be "1. Post-traumatic stress disorder. 2. Anxiety. 3. Depression." (Tr. 680).  His medication is switched from Paxil to Zoloft.  This treatment note alludes to the fact that the claimant has no insurance; "He also I[sic] agreed to fill out his paperwork for medicaid. His mom is going to drop it in

and I will fill out to the best of my ability and knowledge. However I do think that there is a possibility for him to receive some medical coverage because of his condition." (Tr. 680). On the same date, the claimant contacted Aspire requesting treatment (Tr. 821). It is also noted that he has no insurance (Tr. 821).

The claimant was seen for a second Consultative Examination with Dr. Bryan London, Ed.D, HSPP February 29, 2012. Dr. London notes that claimant's mother participated in the evaluation with his permission (and as such was present with him) (Tr. 691). Dr. London notes provisional diagnoses of 309.81 PTSD, 296.22-Major Depressive Disorder, Single Episode, Moderate Severity, 300.21 Panic Disorder With Agoraphobia, 300.00 Anxiety Disorder NOS. He also diagnosed 305.00 Alcohol Abuse- Sustained Full Remission, 304.30 Cannabis Dependence- Sustained Full Remission. Dr. London notes a possibility of Borderline Intellectual Functioning (Tr. 699). With respect to panic attacks, Dr. London notes;

> "The claimant reports a history significant for panic disorder with agoraphobia. He reports his most recent panic attack occurred two days ago. He endorsed symptomatology including tachycardia, difficulty breathing, tight muscles, dizziness, and GI distress. The claimant said that over the last 12 months he has experienced panic attacks at a frequency of "at least a couple of times a week."(Tr. 693).

Amy S. Johnson, Ph.D., again completes a Mental Residual Functional Capacity Assessment on March 9, 2012 as a non-examining source without the benefit of treatment notes from Aspire or Dr. Rosiek. Dr. Johnson notes that the claimant would be moderately limited with respect to the following:

> A. Understanding and Memory:
>     3. The ability to understand and remember detailed instructions- Moderately Limited (Tr. 700)
> B. Sustained Concentration and Persistence:
>     5. The ability to carry out detailed instructions -Moderately Limited (Tr. 700)
>     6. The ability to maintain attention and concentration for extended periods- Moderately Limited (Tr. 700)
>     7. The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances- Moderately Limited (Tr. 700)
>     11. The ability to complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods -Moderately Limited (Tr. 701)
> D. Adaption:
>     17. The ability to respond appropriately to changes in the work setting- Moderately Limited (Tr. 701).

Dr. Johnson evaluated the claimant under 12.04 and 12.06. With respect to Listing 12.06, Dr. Johnson indicates that the claimant has a "medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above" and lists the disorder as "PTSD provisional Panic DO with agoraphobia provisional Anxiety DO NOS" (Tr. 709). Dr. Johnson found the claimant to have Moderate Difficulties in Maintaining Concentration, Persistence, or Pace (Tr. 714).

The claimant finally began mental health treatment in January 3, 2012 (Tr. 760) at Aspire where he engaged in medication management, individual, and group therapy. Dr. Betsy Rosiek, MD, a physician board certified in Psychiatry by the American Board of Psychiatry and Neurology (Tr. 850) and who has met her maintenance of certification requirements (MOC) requirements in psychiatry (Tr. 850) is the claimant's treating psychiatrist. Dr. Rosiek completed three Mental Residual Functional Capacity Questionnaires detailing the claimant's limitations. The first was on July 3, 2012 (Tr. 723-730) after having treated the claimant for approximately six months. The second was on February 15, 2013 (Tr. 778-785) after treating the claimant for over a year, and the third was June 24, 2013, after treating the claimant for a year and a half (Tr. 824-831).

At the time of completion of the first Mental Residual Functional Capacity Questionnaires of July 3, 2012 (Tr. 723-730) by Dr. Rosiek, the clamant had been seen at Aspire approximately 18 times and had been seen personally by Dr. Rosiek on at least five separate occasions including January 25, 2012 (Tr. 753-754), February 28, 2012 (Tr. 748-749), April 24, 2012 (Tr. 740), May 22, 2012 (Tr. 738), and June 15, 2012 (Tr. 735). Dr. Rosiek notes the claimant's DSM-IV Axis I diagnoses to be PTSD and Major Depression-single episode-chronic. She notes the GAF to be 55. Dr. Rosiek notes the claimant's symptoms as anhedonia or pervasive loss of interest in almost all activities; decreased energy; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; persistent disturbances of mood or affect; change in personality; apprehensive expectation; emotional withdrawal or isolation; motor tension; vigilance and scanning; easy distractibility; and sleep disturbance (Tr. 725). With respect to the claimant's Abilities and Aptitudes Needed to do Unskilled Work, Dr. Rosiek notes that the claimant is

unable to meet competitive standards in four (4) areas and has no useful ability to function in one (1) area: to wit, the claimant is unable to meet competitive standards with respect to his ability to:

- Maintain regular attendance and be punctual within customary usually strict tolerances
- Perform at a consistent pace without an \unreasonable number and length of rest periods
- Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes
- Deal with normal work stress (Tr. 726).

The claimant has "no useful ability to function" with respect to his ability to:

- Complete a normal workday and workweek without interruptions from psychologically based symptoms (Tr. 726).

Dr. Rosiek notes, "He exhibits impaired concentration, anxiety, that would impact his ability to work with others, very limited coping skills" (Tr. 726). With respect to the claimant's Mental Abilities and Aptitudes Needed To Do Semi-skilled and Skilled Work, the claimant is unable to meet competitive standards in all areas (Tr. 727). With respect to the claimant's Mental Abilities and Aptitudes Needed To Do Particular Types of Jobs, the claimant is unable to meet competitive standards with respect to this ability to;

- Interact appropriately with the general public
- Travel in unfamiliar places (Tr. 727)

Dr. Rosiek opines that the claimant has the following functional limitations;

- Marked Restrictions of Activities of Daily Living
- Extreme Difficulties in maintaining social functioning
- Extreme deficiencies of concentration, persistence, or pace (Tr. 728)

Dr. Rosiek also finds that the claimant has;

"Medically documented history of a chronic organic mental, schizophrenic, etc. or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support" (Tr. 728),

and

"A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate"  (Tr. 728).

She opines that the claimant's treatment and impairments would cause him to be absent from work "More than four days per month" (Tr. 729).  Dr. Rosiek's limitations are endorsed by the Aspire treatments notes from January 13, 2012 to July 9, 2012 (Tr. 732-766) where his GAF is actually noted to be 45 rather than 55 as noted by Dr. Rosiek (Tr. 754).

In her second Mental Residual Functional Capacity Questionnaires of February 25, 2013 (Tr. 778-785), Dr. Rosiek has been treating the clamant for over one year, noting that the plaintiff has been a patient since January 25, 2012 (Tr. 779).  In addition to the five times that Dr. Rosiek saw the claimant prior to completing the prior July 2012 Residual Functional Capacity Questionnaires, Dr. Rosiek had seen the claimant an addition seven (7) times (July 27, 2012 (Tr. 813), August 28, 2012 (Tr. 809), September 25, 2012 (Tr. 806), October 30, 2012 (Tr. 803-804), December 5, 2012 (Tr. 800-801), January 9, 2013 (Tr. 798-799), and February 25, 2013 (Tr. 795-796) for a total of 12 visits with Dr. Rosiek.  In addition to the 18 total Aspire visits at the time of the prior July 2012 Residual Functional Capacity Questionnaires, the clamant has 12 additional visits (including the 7 with Dr. Rosiek) for a total of 30 Aspire Visits as of February 25, 2013 (the date of completion of the second Mental Residual Functional Capacity Questionnaires).

In her second Mental Residual Functional Capacity Questionnaires of February 25, 2013 Dr. Rosiek diagnoses the claimant with PTSD and Chronic Major Depression (Tr. 779).  Clinical findings include "anxious affect, depressed, fidgets a lot, excessive worry and apprehension, ongoing PTSD symptoms" and prognosis is noted as "poor" (Tr. 779).  She notes that the treatment and response include "medication management and therapy" with a response of "unfortunately little change overall" (Tr. 779). She notes the claimant's symptoms include all symptoms listed in her July 3, 2012 assessment at Tr. 725, but with the addition of feelings of guilt or worthlessness and motor tension (Tr. 780).  With respect to the claimant's Abilities and Aptitudes Needed to do Unskilled Work, Dr. Rosiek finds that the claimant is unable to meet competitive standards in four (5) areas (which is an increase from the 4 areas noted at Tr. 726) and has no useful ability to function in one (1) area: to wit, the claimant is unable to meet competitive standards with respect to his ability to:

- Maintain attention for two hour segment
- Maintain regular attendance and be punctual within customary usually strict tolerances
- Perform at a consistent pace without an \unreasonable number and length of rest periods
- Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes
- Deal with normal work stress (Tr. 781).

The claimant has "no useful ability to function" with respect to his ability to:

- Complete a normal workday and workweek without interruptions from psychologically based symptoms (Tr. 781).

In addition, the claimant is seriously limited, but not precluded in four (4) areas (Tr. 781), an increase from two (2) areas in the earlier evaluation (Tr. 726). Dr. Rosiek notes, "extremely anxious individual- excessive need for reassurance- no coping skills. I do not see him maintaining a job." (Tr. 781).

With respect to the claimant's Mental Abilities and Aptitudes Needed To Do Semi-skilled and Skilled Work, the claimant is unable to meet competitive standards in all areas (Tr. 782) which is unchanged from the earlier evaluation at Tr. 727. With respect to the claimant's Mental Abilities and Aptitudes Needed To Do Particular Types of Jobs, there is no change in the option of Dr. Rosiek from the July 2012 assessment (Tr. 782).

Dr. Rosiek again opines that the claimant has the following functional limitations;

- Marked Restrictions of Activities of Daily Living
- Extreme Difficulties in maintaining social functioning
- Extreme deficiencies of concentration, persistence, or pace (Tr. 783)

Dr. Rosiek also finds that the claimant again meets the "C" Criteria for Listings12.04 (Tr. 783). She opines that the claimant's treatment and impairments would cause him to be absent from work "More than four days per month" (Tr. 784).

At the time of her Third Mental Residual Functional Capacity Questionnaires of June 24, 2013 (Tr. 824-831) Dr. Rosiek had seen the claimant a total of 14 times, the 12 times indicated above and April 9, 2013 (Tr. 792), May 7, 2013 (Tr. 790). In addition, he has had an addition three total visits at Aspire for a total of thirty three (33) visits with Aspire. In the Third Mental Residual Functional Capacity Questionnaires of June 24, 2013, Dr. Rosiek finds that the claimant has substantially the same symptoms

(Tr. 842) as listed in her July 3, 2012 assessment  (Tr. 725) and in her assessment of February 25, 2015 (Tr. 780).

With respect to the claimant's Abilities and Aptitudes Needed to do Unskilled Work, Dr. Rosiek finds that the claimant is unable to meet competitive standards in six (6) areas (Tr. 843). With respect to the claimant's Mental Abilities and Aptitudes Needed To Do Semi-skilled and Skilled Work, the claimant is again noted to be unable to meet competitive standards in all areas (Tr. 844) which is unchanged from the earlier evaluations at Tr. 727 and Tr. 782.  With respect to the claimant's Mental Abilities and Aptitudes Needed To Do Particular Types of Jobs, Dr. Rosiek opines that the claimant is unable to meet competitive stands with respect to his ability to interact appropriate with the general public, his ability to travel to unfamiliar places, and his ability to use public transportation.  (Tr. 844).

Dr. Rosiek, for the third time and after treating the claimant for a year and a half, opines that the claimant has the following functional limitations;

- Marked Restrictions of Activities of Daily Living
- Extreme Difficulties in maintaining social functioning
- Extreme deficiencies of concentration, persistence, or pace (Tr. 845)

Dr. Rosiek also finds that the claimant again meets the "C" Criteria for Listing 12.04 (Tr. 845). She opines that the claimant's treatment and impairments would cause him to be absent from work "More than four days per month" (Tr. 846).

In Step 1[4] of the of the Sequential Evaluation Process, the ALJ found that the plaintiff "engaged in substantial gainful activity during the following periods: February through April 2008 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and416.971 *et seq.*"(Tr. 24).

At Step 2 of the Sequential Evaluation Process, the ALJ found that the plaintiff has severe impairments consisting of  "post-traumatic stress disorder, major depressive disorder, alcohol abuse, cannabis dependence and anxiety disorder not otherwise specified (20 CFR 404.1520(c) and 416.920(c))."

---

[4] All reference to "Steps" refer to the five-step sequential evaluation process required under 20 CFR § 404.1520(a)(4).

At Step Three of the Sequential Evaluation Process, the ALJ found that the plaintiff did not meet or equal a Listed Impairment of 20 CFR Part 404, Subpart P, Appendix I (Tr. 29) and indicates "The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.09. In making this finding, I have considered whether the "paragraph B" criteria are satisfied." (Tr. 28).  The ALJ goes on to find that in activities of daily living, the claimant has mild restriction, in social functioning, the claimant has moderate difficulties, and with regard to concentration, persistence or pace, the claimant has moderate difficulties. (Tr. 29).

At Step Four, the ALJ found that the claimant had the Residual Functional Capacity (hereinafter "RFC")[5] as follows,

> "After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant could not tolerate exposure to a work enviromnent with a noise level rating of 4 (i.e., loud noise) and 5 (i.e., very loud noise) as those noise level ratings are defined by the Dictionary of Occupational Titles and its companion publication. The work should be limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements. The claimant could not tolerate interaction with the public, could tolerate only occasional interaction with coworkers and only occasional interaction with supervisors. The claimant could not perform tandem tasks with coworkers or with supervisors. The claimant is limited to work that allows the individual to be off task, on average, five percent of the workday in addition to regularly scheduled breaks. The claimant is limited to work that allows, on average, one absence per month with absence defined as failing to appear for a scheduled shift, tardy for a scheduled shift, or leaving early from a scheduled shift." (Tr. 30).

The ALJ opined that the claimant could perform past relevant work as a "store's laborer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965)." (Tr. 34) The store's laborer job was indicated to be described under DOT number 922.687-058,  as medium, unskilled work with an SVP: 2 by Constance Brown, the vocational expert 89 (Tr. 89-90)

At Step Five, the ALJ found that there were other jobs available for the claimant and makes "alternative findings for step five of the sequential evaluation process" (Tr. 35) and indicates that:

> "The claimant was born on May 28, 1977 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963). The

---

[5]  "Residual functional capacity" or "RFC" denotes what an individual can still do, despite his or her limitations. 20 C.F.R. § 404.1545(a).

claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964). The highest grade of school the claimant completed is the eighth grade. The claimant is restricted to performing unskilled work. In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 36)

The ALJ finds that the claimant can perform the following jobs;

> 1) Laundry worker; medium and unskilled with specific vocational preparation of 2; Dictionary of Occupational Titles code 361.685-018 with 5,400 positions in the Indiana economy and 80,000 positions in the United States economy:

> 2) Housekeeper cleaner, light and unskilled with a specific vocational preparation of 2; Dictionary of Occupational Titles code 323.687-014 with 17,000 positions in the Indiana economy and 371,000 positions in the United States economy: and

> 3) Office Machine Operator; light and unskilled with a specific vocational preparation of 2; Dictionary of Occupational Titles code 653.687-010 with 1,300 positions in the Indiana economy and 60,000 positions in the United States economy. (Tr. 36)

It is unclear from the decision if the ALJ included the non-exertional limitations utilized in Step 4 of the Sequential Evaluation Process given the RFC given at the top of page 36.

The ALJ found that the claimant had not been under a disability, as defined in the Social Security Act, from February 1, 2008, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)). (Tr. 37).

## III. Standard of Review

### A. Standard for Disability

The standard for disability is best articulated by *Craft v. Astrue,*

> "A claim of disability is determined under a sequential five-step analysis. *See*20 C.F.R. § 404.1520(DIB); 20 C.F.R. § 416.920(SSI).[6] The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC" ) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled." *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir.2008)

**B. Standard of Review**

Section 42 U.S.C §405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g)." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)  According to 42 U.S.C §405(g), "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  Further, substantial evidence has been defined in the Seventh Circuit as "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996) ·citing *Edwards v. Sullivan,* 985 F.2d 334, 336 (7th Cir.1993) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)).

The Court will only reverse the Commissioner's findings if they are not supported by substantial evidence or if the Commissioner applied an erroneous legal standard. *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir.1996).  The Administrative Law Judge is required to build a "logical bridge" between the evidence and his decision. *Sarchet v. Chater,* 78 F.3d 305, 307 (ih Cir. 1996). Additionally, according to 20 CFR § 404.1527(d)(2), the Administrative Law Judge is required to give more weight to the opinion of treating sources than non-treating sources so long as the treating sources opinion is not inconsistent with other substantial evidence in the case record. If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997).

## IV. Argument

**A.  The ALJ erred at Step 2 of the Sequential Evaluation Process by Finding Alcohol Abuse and Cannabis Dependence to be Severe Impairments.**

The ALJ finds that the clamant severe impairments including, but not limited to, alcohol abuse and cannabis dependence.  Pursuant to 20 CFR § 404.1508, in order to show an impairment to be severe,

" Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms (see § 404.1527). (See § 404.1528 for further information about what we mean by symptoms, signs, and laboratory findings.)

Pursuant to  20 CFR § 404.1528,

 "Symptoms, signs, and laboratory findings.

(a) *Symptoms* are your own description of your physical or mental impairment. Your statements alone are not enough to establish that there is a physical or mental impairment.

(b) *Signs* are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

(c) *Laboratory findings* are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests."

As the diagnosis of cannabis dependence and alcohol abuse are based solely on the claimant's report of historic symptoms to Dr. London at Tr. 646 whereby the clamant indicated that he had "not used cannabis in eight or nine years." (Tr. 646).  Dr. London's Diagnosis is Cannabis Dependence, Sustained Full Remission (Tr. 648) and Alcohol Abuse, Early Full Remission (Tr. 648).  These diagnoses were again noted as being in remission in Dr.  London's second Consultation Examination at Tr. 699.  There are no laboratory findings or signs noted.

Furthermore, pursuant to SSR 96-3p, "the evaluation of whether an impairment(s) is "severe" that is done at step 2 of the applicable sequential evaluation process set out in 20 CFR 404.1520, 416.920, or 416.924 **requires an assessment of the functionally limiting effects of an impairment(s) on an individual's ability to do basic work activities** . . . " (emphasis added). **The ALJ has made no such assessment of the functionally limiting effects of the alleged impairments alcohol abuse or cannabis dependence** (again, both of which were deemed in remission by Dr. London and neither of which were

ever mentioned by Dr. Rosiek, the claimant's treating psychiatrist during the year and a half of Aspire

records contained in the file), yet she finds that they are "severe impairments".

The finding of alcohol abuse or cannabis dependence are without merit and are prejudicial to the

claimant by attempting to diminish the claimant's credibility based on perceived undesirable behavior of

years past.  This is not harmless error.  Given the ALJ's obvious prejudice towards the claimant, the case

should be remanded to provide the claimant with an opportunity for a full and fair hearing that addresses

his current severe impairments, and not those in remission.

**B.  The ALJ erred at Step 2 of the Sequential Evaluation Process by Failing to Consider All of the Plaintiff's Medically Determinable Impairments.**

As noted above, the ALJ found At Step[6] 2 of the Sequential Evaluation Process, the ALJ found

that the plaintiff had severe impairments consisting of  "post-traumatic stress disorder,

major depressive disorder, alcohol abuse, cannabis dependence and anxiety disorder not otherwise

specified " (Tr. 25).  The ALJ makes no mention of any other non-severe impairments.

The ALJ dismisses the claimant's panic disorder with agoraphobia indicating,

> "Although a provisional diagnosis of panic disorder with agoraphobia was proposed
> (Exhibit 1 F at 10), a conclusion was never reached. While a possible borderline
> intellectual functioning was noted (Exhibit 1 lF at 10), the totality of the medical
> evidence fails to establish such diagnosis. Similarly, while it been suggested that the
> claimant might have a cognitive disorder (Exhibit 4F at 8), the preponderance of the
> evidence does not support such a conclusion. These diagnoses are not medically
> determinable impairments within the meaning of the Act, given the lack of support in the
> objective medical evidence." (Tr. 26)

As the ALJ does not find the claimant's panic disorder to be a medically determinable impairment, it

follows that she could not consider it to be severe impairment.  The finding that the claimant's panic

disorder is neither a medically determinable impairment nor a severe one is contrary to the weight of the

evidence.  The diagnosis of panic disorder is found at Tr. 699 by Dr. London whom the ALJ gives

controlling weight by virtue of its support of the State Agency opinion.[7] (Tr. 33).  Dr. London notes;

---

[6] All reference to "Steps" refer to the five-step sequential evaluation process required under 20 CFR § 404.1520(a)(4).

[7] In reference to the State Agency Determination, "It has close correspondence to the objective medical evidence. It is supported by the clinical data from Dr. Gasiewicz, Dr. London and Aspire. The State

"The claimant reports a history significant for panic disorder with agoraphobia. He reports his most recent panic attack occurred two days ago. He endorsed symptomatology including tachycardia, difficulty breathing, tight muscles, dizziness, and GI distress. The claimant said that over the last 12 months he has experienced panic attacks at a frequency of "at least a couple of times a week."(Tr. 693).

Evidence of the claimant's panic attacks are found at (Tr. 758, 757, 753 (which notes panic attacks about four times per week), 797, 733, 808, 797, 794, and 788).  In the Aspire notes, the claimant's goal is to manage his panic attacks so he can feel less depressed and be more active.  (Tr. 733). The claimant would assert that his panic attacks/ panic disorder should be considered a severe impairment as it has more than a minimal effect on the claimant's ability to perform basic functional activities.

The claimant's impaired attention and concentration should also be considered a severe medically determinable impairment.  Impaired attention and concentration are noted at Tr. 748, 753, 765, 735,738, 740, 811, 806, 803, 800, and 726 on mental status examinations by Dr. Rosiek.  While impaired attention and concentration could be considered a symptom, pursuant to SSR 96-3p, "2.  An individual's symptoms may cause limitations and restrictions in functioning which, when considered at step 2, may require a finding that there is a "severe" impairment(s) and a decision to proceed to the next step of sequential evaluation."

Given the foregoing, the ALJ should have found the claimant's panic attacks/panic disorder and the claimant's impaired attention and concentration to be severe medically determinable impairment. Clearly the claimant suffers from these medically determinable impairments which are established by documented signs, symptoms, and laboratory findings in addition to those post-traumatic stress disorder, major depressive disorder, and anxiety disorder not otherwise specified which are mentioned as severe impairments.   As the ALJ fails to discuss the claimant's panic attacks and the claimant's impaired attention and concentration , her decision is not supported by the record as a whole.

When the ALJ fails to mention relevant impairments, the ALJ could not have considered the combined impact of those impairments which is required; in assessing RFC, "an ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in

agency opinion is very probative of the claimant's mental status and entitled to significant weight." (Tr. 33).

isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). See *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) ("Even if each problem assessed separately were less serious than the evidence indicates, the combination of them might well be totally disabling.").  Even where an ALJ states that she has considered the entire "combination of impairments, " *Arnett v. Astrue*, 676 F.3d 586, 590 (7th Cir. 2012), a reviewing court may still remand because the ALJ fails to mention relevant evidence or consider the combined impact of all impairments taken together, id. at 591-94.  The ALJ is not permitted to simply ignore the evidence which does not support his conclusion, to wit;

> "It is worth repeating that "an ALJ may not ignore an entire line of evidence that is contrary to her findings," *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999), rather she must "articulate at some minimal level [her] analysis of the evidence" to permit an informed review. *Clifford*, 227 F.3d at 872. Here (as noted above), the ALJ mentions only the medical evidence favoring the denial of benefits. And from her analysis, we are unable to discern whether she considered the record as a whole. Indeed, she made no mention of Zurawski's MRI results, and several of the medical findings that she relied on concerning Zurawski's capacity to work, including that of Dr. Semba, Dr. Spencer, and Dr. Deskin, were rendered before the MRI was ever taken. Although the ALJ also supported her decision with findings by ERGOS and Dr. Ghaly, she made no attempt to explain why the other evidence in the record, which appears to favor Zurawski (e.g., the MRI results), was overcome by the evidence on which she relied. For instance, the ALJ mentioned only Dr. Ghaly's November 14, 1996 report, which does not address (or, for that matter, rebut in a substantial way) the objective medical evidence favoring Zurawski's claim. While we have never required an ALJ to address every piece of evidence or testimony in the record, the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits. In this case, the ALJ's decision simply fails to permit an informed review, and therefore, a remand for a redetermination of Zurawski's residual functional capacity is necessary." *Zurawski v Halter*, 245 F.3d 881, 888-889 (7th Cir. 2001)

Given the foregoing, a remand is required.

Furthermore, it cannot be assumed that the ALJ's finding of Anxiety NOS as a severe impairments includes "panic attacks" as contrary to SSR 96-3p, "the evaluation of whether an impairment(s) is "severe" that is done at step 2 of the applicable sequential evaluation process set out in 20 CFR 404.1520, 416.920, or 416.924 requires an assessment of the functionally limiting effects of an impairment(s) on an individual's ability to do basic work activities."  The ALJ provides no such discussion.

 The ALJ is under an obligation to explain her decision with a "minimal level of articulation."

 "By "minimal level of articulation" we mean just that--enough to show that the ALJ considered the

evidence the law requires him to consider." *Stephens v. Heckler*, 766 F.2d 288, 290 (7th Cir. 1985). "Further, the ALJ must explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *See Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir.2004); B*rindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir.2003) *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). "The purpose of requiring this minimal level of articulation is merely to enable us to determine from an ALJ's opinion whether the ALJ considered and assessed the relevant evidence, a determination which is essential if we are to perform our statutorily-mandated review function." *Stephens v. Heckler*, 766 F.2d 284, 290 (7th Cir. 1985) citing *Zalewski*, 760 F.2d at 167.

The ALJ has an obligation to explain her decision in a way that permits reviewing bodies the ability to determine if he has considered the relevant evident in the record and that his decision is logically, and not just based solely on the reports of consultative examinations and non-examining sources.   The ALJ in this matter has failed to meet that minimum level of articulation with respect her articulation of severe impairments and the functional limitations imposed by severe impairments, whether the claimant suffers from additional non-severe impairments, what impairments the ALJ has actually considered.  Due to his failure to articulate his rationale for her decision, it is unclear if the ALJ considered the relevant medical evidence of the record.

**C.  The ALJ Fails in Step 3 of the Sequential Evaluation Process to Articulate Why the Claimant Did Not Meet a Listing**

With respect to whether or not the claimant meets a listing, the ALJ opines"

> **"The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpa11 P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**
>
> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.09. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration,

persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (Tr. 28-29)

The ALJ goes on to discuss the four functional areas of the "B" Criteria.  This is contrary to 20 CFR §

404.1520a, which is required when analyzing whether a claimant has a medically determinable mental

impairment and whether that impairment causes functional limitations.  "The special technique requires

that the ALJ evaluate the claimant's "pertinent symptoms, signs, and laboratory findings" to determine

whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1)."

*Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008).  The ALJ's failure to discuss the "pertinent symptoms,

signs, and laboratory findings" of the claimant's medically determinable impairments prior to discussing

the "B" Criteria renders her opinion insufficiently articulated and contrary to 20 CFR § 404.1520a and

requires remand.

### D.  The ALJ erred by failing to give controlling weight to the Trateing Source- Dr. Betsy Rosiek at Step 4 when determining the claimant's RFC

With respect to Dr. Rosiek, the ALJ opines,

"Dr. Rosiek's opinion is extreme in nature. There is no other opinion of record indicating that the claimant's limitations even approach those specified by Dr. Rosiek. Further, it is not consistent with the mental status examinations reported by Aspire, which is the agency providing the claimant's mental health treatment. These reports generally show that the claimant is cooperative and polite, is adequately groomed, is oriented, has appropriate and unremarkable thought content, has logical, coherent and sequential thought processes, has normal speech, has a fair and intact memory, has average intellectual functioning and has normal psychomotor behavior (Exhibit 18F at 4, 17, 22 and 33). These findings are consistent with the findings from Dr. Gasiewicz and from Dr. London. Further, Dr. Rosiek actually reports global assessment of functioning scores of 55. These scores are indicative of moderate symptoms or moderate difficulty in social, occupational or school functioning rather than the extreme problems reported by Dr. Rosiek. The global assessment of functioning scores of 55 are also consistent with the clinical records. Dr. Rosiek has seen the claimant only since January 2012. Dr. Rosiek's responses regarding the number of absences is unsupported by the totality of the medical evidence and speculative in nature. In addition, Dr. Rosiek relies, in part, upon the claimant's reports. While Dr. Rosiek's opinions have been considered, they are not assigned significant weight for these reasons."  (Tr. 34).

The ALJ mischaracterizes the reports of Dr. Rosiek.  As noted above, Dr. Betsy Rosiek, MD, a physician

board certified  in Psychiatry by the American Board of Psychiatry and Neurology (Tr. 850) and is the

claimant's treating psychiatrist.  Dr. Rosiek completed three Mental Residual Functional Capacity

Questionnaires detailing the claimant's limitations.  Contrary to the erroneous allegations of the ALJ, the reports of Dr. Rosiek are consistent with the reports of Aspire.  Contrary to the assertions of the ALJ, these reports do not find simply that the claimant is unremarkable on mental status exam, but rather due to a panic attacks, impaired attention/concentration, and psychomotor status of "impaired dexterity" (Tr. 764).  Further, the reports of Aspire are *more* restrictive than Dr. Rosiek, finding that the claimant has a GAF of 45.

The Mental RFC was completed on July 3, 2012 (Tr. 723-730) after having treated the claimant for approximately six months.  Dr. Rosiek's limitations are endorsed by the Aspire treatments notes from January 13, 2012 to July 9, 2012 (Tr. 732-766).

- In January of 2012, the claimant is seen by Aspire on approximately five (5) occasions.  On the clinical worksheet of 1/3/2012 completed by Gary Scott, LMHC, issues needed attention include adjustment to trauma, affect regulation, anxiety, depression, intrusions, and living skills (Tr. 760).  The Intake Evaluation of 1/3/2012 notes that the claimant " can't concentrate and able to learn new skills to hold a job" (Tr. 754).  Psychomotor status notes "impaired dexterity" (Tr. 764) and attention/concentration are noted to be "impaired" (Tr. 765).   Learning Barriers that will Impact Therapy are listed as "Cognitive difficulties." (Tr. 765).  Diagnostic Impressions include PTSD with delayed onset and a GAF of 45 (Tr. 765). In the treatment plan of 1/4/2012, the claimant is diagnosed with Posttraumatic Stress Disorder, Delayed Onset- 309.81.  The claimant's panic attacks are also noted as is his GAF of 45 (Tr. 758).  The claimant presents for individual therapy on 1/10/2012  at which time it is noted that he is unable to work at this point in time and is experience panic attacks which include "difficulty breathing, heaviness in chest, etc." (Tr. 757) .  The claimant presents for group therapy 1/17/2012 whereby it is noted that the claimant is having panic attacks approximately four times per week (Tr. 756).  He presents again for group therapy on 1/24/2012 (Tr. 755). In the 1/25/2012 Psychiatric Evaluation, signs and symptoms of PTSD include " Signs and symptoms of the problem include avoidance, repetitive thoughts or images, recurrent memory of events, anxiety, nightmares and hypervigilence and acute panic attacks about four times/wk." (Tr. 753).  His attention/ concentration are noted to be impaired on mental status assessment (Tr. 753).  He is diagnosed as having Posttraumatic Stress Disorder, Delayed Onset- 309.81, Major Depression, chronic and a GAF of 45 (Tr. 754).
- In February 2012, the claimant is seen by Aspire on approximately five (5) occasions over four days. During the group therapy session of February 7, 2012, it is noted that in Client's Response to Therapy, " cl. somewhat unintentionally inappropriate at times- seems to miss social cues. would likely be appropriate for cl. to address his trauma issues with irx therapist as that seems to be biggest factor contributing to his anxiety." (Tr. 752). The claimant presents for group therapy on  February 14, 2012  (Tr. 751).  His increased difficulty in getting to treatment due to his move to Avon, Indiana is discussed (Tr. 751).  The claimant presents for group therapy on February 21, 2012 (Tr. 750) and is given information on Cummins Mental Health as the claimant and his mother have moved to Avon (Tr. 750).  In the Medication Review/Doctor Contact note of February 28, 2012, Dr. Rosiek notes the claimant's affect/mood to be "depressed, sad, blunted affect," with psychomotor "somewhat slowed" and attention/concentration noted as "impaired" (Tr. 748).  His behavior is noted as "cooperative and quite polite" (Tr. 748).  It is again noted that the claimant presents with his mother (Tr. 748).  The claimant presents for group therapy on February 28, 2012 (Tr. 747).

- In March of 2012, the claimant is seen at Aspire on two occasions. The claimant presents for Group Therapy on March 6, 2012 (Tr. 746), and again on March 13, 2012 where the claimant discusses his brother's death and the impact on him emotionally (Tr. 745). He also discusses his decreasing attendance at group therapy due to having to drive so far (Tr. 745).
- In April of 2012, the claimant is seen at Aspire on three occasions. During his group therapy session on April 3, 2012 (Tr. 743) it is noted that the claimant "participation. lacks some insight. continuing to struggle with lack of sleep and high anxiety level at night." (Tr. 743). He also attends group therapy on April 17, 2012 (Tr. 742). In the Medication Review/Doctor Contact note of April 24, 2012, Dr. Rosiek notes "depressed, sad, blunted affect," with thought process noted as "circumstantial" and attention/concentration noted as "impaired" (Tr. 740). His behavior is noted as "cooperative, quite polite, but tends to interrupt and somewhat fretful in presentation" (Tr. 740). Dr. Rosiek notes that the clamant appears with his mother (Tr. 740).
- In May of 2012, the claimant is seen only br. Dr. Rosiek. In the Medication Review/Doctor Contact note of May 22, 2012, Dr. Rosiek notes that "Ernest Oliver is being followed due to Major Depression, Single Episode, Chronic and Posttraumatic Stress Disorder, Delayed Onset. (Tr. 738). He is noted to have "depressed mood, blunted affect," with attention/concentration noted as "impaired" (Tr. 738).
- In June of 2012, the claimant has two visits at Aspire. During his 6/15/2012 Medication Review, the claimant's concentration is noted to be impaired by Dr. Rosiek (Tr. 735). In his group therapy note of June 22, 2012, his response to therapy is noted as "continuing to report high level of anxiety. Focusing and ruminating on the past. Continuing to have panic attacks at night." (Tr. 737).
- In the 7/9/2012 Treatment plant, the claimant is noted to have a GAF of 45, with the highest GAF in the past year to be 45. (Tr. 733). The claimant's goal is to manage his panic attacks so he can feel less depressed and be more active. (Tr. 733). His barrier to treatment is his "lack of anxiety management skills as evidenced by his report of continuing and intensifying flashbacks, nightmares, panic attacks and forgetfulness (Tr. 733).

The second Mental RFC was completed by Dr. Rosiek was on February 25, 2013 (Tr. 778-785)

after treating the claimant for over a year. Dr. Rosiek's limitations are endorsed by the Aspire treatments

notes from July 2012 to February 2013.

- Claimant has two (2) contacts with Aspire in July 2012. In the July 9, 2012 treatment plan signed by Dr. Rosiek, the claimant's diagnosis is Axis I: Posttraumatic Stress Disorder, Delayed Onset-309.81 , Major Depression, Single Episode, Chronic-296.20 and he is noted to have a GAF of 45 which is also noted to be the highest in the past year. (Tr. 813). On July 27, 2012, the clamant has a Medication Review with Dr. Rosiek. She notes his behavior is "cooperative, but tends to be timid, apologetic for running out of meds and worrisome [sic]." She notes is attention/concentration to be impaired (Tr. 811)
- He is seen once in August 2012 by Dr. Rosiek. On August 28, 2012, the clamant has a Medication Review with Dr. Rosiek. It is noted that he will be getting Medicaid which will help with financial pressures regarding appt, mediations, etc. (Tr. 809). His affect/mood are noted to be "depressed, tearful, anxious" (Tr. 809).
- In September 2012, the claimant is seen for an hour of individual counseling and seen by Dr. Rosiek for medication management. On September 11, 2012, the clamant receives individual therapy with Anne Overdorf, LCSW. She notes that this is the first session in a few months due to transportation issues. Claimant continues to have anxiety, panic, panic attacks, and flashbacks. He also talked about domestic violence situations he witnessed with his mom and her different partners (Tr. 808). On September 25, 2012, the he clamant has a Medication Review with Dr.

Rosiek.  She notes that he "continues to present apologetic, anxious and w/ much need for reassurance" (Tr. 806).  Attention and Concentration are again impaired. (Tr. 806).

- In October 2012, the claimant is seen for an hour of individual counseling with Ms. Overdorf and seen by Dr. Rosiek for medication management. .On October 30, 2012, the clamant receives individual therapy with Anne Overdorf, LCSW.  She notes that he lacks any progress in gaining skill to deal with his emotions. (Tr. 805). On October 30, 2012, the clamant has a Medication Review with Dr. Rosiek (Tr. 803-804).  His attention/ concentration are noted to be impaired.  It is noted that he sleeps only a few hours a night (Tr. 803),

- In December 2012, the claimant is seen for an hour of individual counseling with Ms. Overdorf and seen by Dr. Rosiek for medication management.  On December 5, 2012, clamant receives individual therapy with Anne Overdorf, LCSW (Tr. 802).  His response to therapy is noted as " cl. remains very slow to process. thought process is very slow. lacks much insight or progress in making any changes. he remains frustrated with his life and current circumstances. he states that therapy helps him and continues to state that he is very grateful for all of the help that he has received" (Tr. 802).        On December 5, 2012, the clamant has a Medication Review with Dr. Rosiek (Tr. 800-801).  His intellectual functioning is noted to be "average-below" and attention/ concentration are noted to be impaired (Tr. 800)

- In January 2013, he has just one appointment.  On January 9, 2013, the clamant has a Medication Review with Dr. Rosiek (Tr. 798-799).

- He has two appointments again in February 2013.  On February 6, 2013, claimant receives individual therapy with Anne Overdorf, LCSW due to his difficulty dealing with anxiety and panic (Tr. 797).  On February 25, 2013, the clamant has a Medication Review with Dr. Rosiek (Tr. 795-796)

The third Mental RFC was completed by Dr. Rosiek was June 24, 2013, after treating the claimant for

a year and a half (Tr. 824-831).   Dr. Rosiek's limitations are endorsed by the Aspire treatments notes from

March 2013 to July 2013.

- In April 2013, the claimant has one appointment with Dr. Rosiek and one with Ms. Overdorf.  On April 3, 2013, the clamant receives individual therapy with Anne Overdorf, LCSW with the goal of improving the claimant's ability to manage panic and anxiety. The claimant sleeps  2-4 hrs per night.  Ms. Overdorf notes he is " he is frustrated because he feels like he should be productive-working, married. 'my brother has all that.' continues to have a lot of anxiety and guilt about not being able to help his mom financially and continues to worry about when she is not going to be around as he is very dependent on her." (Tr. 794).  The April 9,  2013 Medication Review with Dr. Rosiek notes, "comments: Ernest really isn't any better, still trouble with sleeping, high anxiety, and PTSD symptoms " and his intellectual functioning is noted to be "average and below average" and attention and concentration are noted to be poor (Tr. 792).  Side effects of mediation are noted to be dizziness, dry mouth, unsteadiness, and blood pressure changes (Tr. 793).

- The May 7, 2013 Medication Review with dr. Rosiek notes "mood disorder and anxiety disorder" deprived as being "severe" with psychiatric symptoms that include nightmares, poor sleep, anxiety, agitation, feeling "sick", anxious, and depressed (Tr. 790).  His thought process is noted as "racy" and his thought content is noted as "obsessive,' attention and concentration are noted to be poor, mood and affect are noted to be "depressed, anxious, restricted" and psychomotor is restless (Tr. 790). His intellectual functioning is noted to be "average and below average" (Tr. 790).

- June 6, 2013 Treatment plan notes PTSD with Delayed onset and Major Depression, Single Episode, Chronic (Tr. 788). Barriers to treatment are noted as "lack of anxiety management skills

as evidenced by his report of continuing and intensifying flashbacks, nightmares, panic attacks and forgetfulness"  He is noted to be progressing more slowly than expected (Tr. 788)

According to SSR 96-2p, "If a treating source's medical opinion is well- supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted."  It is the claimant's contention that the opinion of Dr. Rosiek is well supported by the over 30 visits at Aspire, as opposed to two consultative examinations with Dr. London and as such, Dr. Roseik should be given controlling weight.

In comparison to those of other health professional, the opinion of a treating source is entitled to greater weight, at least when the ability to observe the patient is essential to accurately understand the patient's condition. *Garrison v. Heckler,* 765 F.2d 710.   A treating source who has examined the claimant over a period of months and perhaps years has had more of an opportunity to assess the claimant and claimant's capabilities as opposed to a source who has only examined the patient once. (See 70 Am Jur. 2d § 719).  The opinion of a consulting source who conducts an examination, but sees the patient for a very short period of time should be obviously entitled to lesser weight.  Where evidence presented by a treating source is determined to be credible, it should be afforded controlling weight in the absence of evidence to the contrary.  *Whitney v. Schweiker*, 695 F.2d 784.

It is elementary that the Social Security Administration must follow its own rules and regulations. By regulation, the Social Security Administration must generally:

(a)     give more weight to an "examining source" than a source who has not examined claimant.
(b)     give more weight to "treating source" than a "non-treating source."
(c)     give more weight to a longer treating source than a shorter treating source.
(d)     give more weight to a treating source who has ordered examinations or consults from specialists and independent laboratories than a treating source who has not.
(e)     give more weight to a medical source who provides relevant evidence to support an opinion.
(f)     give more weight to opinions which are consistent with the record as a whole.
(g)     give more weight to a specialist about medical issues related to his or her areas of specialty than to the opinion of a source who is not a specialist.  See 20CFR § 404.1527(a).

Given these requirements, deference should be given to the professional opinions of Dr. Betty Rosiek.   Dr. Rosiek is the claimant's current treating physician and further, is a board certified specialist

in the field of psychiatry.

The federal courts in some cases have strictly limited the weight to be given to a non-examining source's opinion. In *Carver v Harris*, 634 F.2d 363 (7th Cir. 1980), the Court held that a non-examining physician's opinion alone does not support a finding of non-disability. As such, the opinion of the State Agency, to whom the ALJ gave the greatest weight, cannot be used to support a finding of non-disability.

It is clear that the Social Security Administration may rely on the opinion of a medical advisor which differs from that of the treating physician. However, it is submitted that when this occurs the Administrative Law Judge must make specific reasons which would support such a deviation from the general rule detailed in the regulation. Those reasons *must be valid* and *cannot rely on impermissible procedures* (such as crediting only certain portions of the treating physician's report). *Hurst v. Secretary of HEW*, 753 F.2d 517 (6th Cir. 1885). The substantial weight accorded to treating sources's opinions and medical reports require that the Social Security Administration specifically consider those reports. If the Social Security Administration ignores or fails to refute the treating source's testimony, it will be deemed to have taken it as true. *MacGregor vs. Bowen*, 786 F.2d 1050 (11th Cir. 1986). The courts have held that the opinion of a consulting physician who actually examines the claimant may provide sufficient evidence to support a denial decision despite the presumptions favoring treating physicians *if* the consulting physician's opinion is supported by substantial evidence such as his examination of the claimant and acceptable test results. *Bloodsworth v. Heckler,* 703 F.2d 1233 (11th Cir. 1983). Of course, consulting source's opinions which are consistent with those of the treating sources's control over the personal opinions of the Administrative Law Judge. *Wilson v. Heckler,* 743 F.2d 218 (4th Cir. 1984).

When an Administrative Law Judge rejects testimony of a claimant and the medical testimony offered by a claimant of a treating source, there is a considerable obligation to be specific and a burden to examine the whole record and not simply select bits and pieces and ignore substantial evidences to the contrary (which the ALJ has done). *Belden v Heckler*, 580 F.Supp 315 (D.C. Ind 1984). In the instant case, the opinions of the treating source, Dr. Rosiek, are detailed and supported by their records and test results. Unless there is really some compelling reason to disregard these sources, their reports should

require a finding of disabled.

## V. Conclusion

The ALJ's decision contained errors of law and not supported by the substantial evidence of the record.  She fails to articulate the reasons for her findings and as such, the decision should be remanded.

Respectfully submitted this 16th  day of November,  2015.

 /s/ Jennifer M. Hess

Jennifer M. Hess, Counsel for the Plaintiff (#24227-49)
HESS HESS & DONNELSON
2000 E. 116th Street, Suite 106
Carmel, IN 46032
Telephone:      (317) 844-1377
Fax:              (317) 844-1408
Email:  JenHessAtty@aol.com
          Jen.Hess@HessAndHessLaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 20155, a copy of the foregoing Plaintiff's Brief in Support of Judicial Review was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's CM/ECF system.  Parties may access this filing through the Court's system.

Kathryn E. Olivier, Esq.
Assistant United States Attorney
UNITED STATES DISTRICT ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

  /s/ Jennifer M. Hess
Jennifer M. Hess, Counsel for the Plaintiff

Jennifer M. Hess, Counsel for the Plaintiff (#24227-49)
HESS HESS & DONNELSON
2000 E. 116th Street, Suite 106
Carmel, IN 46032
Telephone:      (317) 844-1377
Fax:              (317) 844-1408
Email:  JenHessAtty@aol.com
          Jen.Hess@HessAndHessLaw.com